IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GARY WILLERT, LISA WILLERT,
LASERMASTERS, LLC, and GPS HOLDINGS,
LLC,

       Plaintiffs,       OPINION & ORDER

 v.

                       17-cv-496-jdp

BRUCE ANDRE and LIBERTY PARTS TEAM,
INC.,

       Defendants.

---

   Plaintiffs Gary and Lisa Willert are the sole members of plaintiff LaserMasters, LLC, a refurbisher of toner cartridges for printers. In 2014, LaserMasters, through its subsidiary, plaintiff GPS Holdings, LLC, acquired Global Printer Services, Inc., (a printer remanufacturer) from defendant Bruce Andre. Plaintiffs allege that Andre breached the contract covering the acquisition by encouraging several GPS employees to leave GPS and work for its competitor, defendant Liberty Parts Team, Inc., and falsely informing GPS customers that GPS had gone out of business. Plaintiffs allege that Liberty then stopped paying LaserMasters for the parts it purchased. Plaintiffs assert various state-law claims against defendants. Dkt. 25.

   Liberty moves to dismiss several of plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). Dkt. 28. The court will grant Liberty's motion in part, dismissing plaintiffs' claims of tortious interference with their relationships with Andre and their customers and their claim under Wisconsin's Deceptive Trade Practices Act.

ALLEGATIONS OF FACT

The court draws the following facts from plaintiffs' complaint, Dkt. 25, and accepts them as true for the purpose of deciding Liberty's motion. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016).

This case concerns the printer and printing supply refurbishing and remanufacturing industry. There are three main types of businesses in this industry: (1) remanufacturers, which rebuild printers and printing supplies, such as toner cartridges, to the original manufactured product's specifications using reused, repaired, and new parts; (2) refurbishers, which clean and repair minor defects in printers and printing supplies; and (3) parts suppliers, which supply parts for remanufacturers and refurbishers.

Way back in 1989, David Reinke became CEO of Parts Now, LLC, a parts supplier. In 1992, defendant Bruce Andre joined Parts Now as a sales representative. In 1995, Andre left Parts Now to found Global Printer Services, Inc., a printer remanufacturer. But he remained friends with Reinke; the two had a "'gentleman's agreement' regarding the segment of the industry each would occupy." Dkt. 25, ¶ 31. Around 1999, Reinke sold Parts Now. He later started defendant Liberty Parts Team, Inc., another parts supplier.

Meanwhile, in 1996, plaintiffs Lisa and Gary Willert bought LaserMasters, LLC, a toner cartridge refurbisher and remanufacturer. On June 11, 2014, LaserMasters acquired Global Printer Services from Andre. Under the terms of the contract governing the acquisition, GPS was to pay Andre $5,500,000 and LaserMasters was to issue Andre 75,000 membership interests in LaserMasters. In exchange, Andre agreed not to solicit any GPS customers, employees, or independent contractor or own, manage, advise, or consult any person or entity engaged in printer remanufacturing sales and services for five years. Neither Andre nor the

Willerts was to make any derogatory or disparaging statement about each other. After the acquisition, Andre remained president of GPS. In September 2015, LaserMasters acquired Parts Now. In November 2015, Andre stopped working for GPS and sold his membership interest in LaserMasters back to the Willerts. Under a series of contracts governing the buyout, the Willerts agreed to pay Andre $2,150,000; Andre reaffirmed that he would not solicit any GPS customers, employees, or independent contractor or own, manage, advice, or consult any person or entity engaged in printing remanufacturing sales and services; and all reaffirmed that they would not make any derogatory or disparaging statement about each other.

Here's where things turned south. Plaintiffs allege that Andre and Liberty began colluding to poach GPS employees and enter the printer remanufacturing business in competition with GPS. They allege that during and after the buyout, Andre hosted several parties for GPS employees and made derogatory or disparaging remarks about plaintiffs at one of those parties. Several months after the buyout, he visited GPS's Wisconsin offices and met privately with several GPS employees. GPS employees began leaving GPS to work for Liberty. One of them, Gregory Kastenmeier, was the GPS production manager and was privy to GPS's confidential and proprietary information, including standard operating procedures and checklists for remanufacturing printers. Kastenmeier brought the standard operating procedures and checklists with him to Liberty, at Liberty's request. Liberty sought GPS salary information and price lists from former GPS employees and offered cash incentives for poaching additional GPS employees. In total, about 10 GPS employees moved to Liberty, representing about 15 percent of GPS's workforce.

As soon as Liberty hired Kastenmeier, it started remanufacturing printers. It lied about this, telling the Willerts that it wasn't remanufacturing printers but telling GPS customers not

only that it was entering the remanufacturing business but that GPS was leaving the remanufacturing business. For example, a Liberty employee sent the following email to a GPS customer:

> Since [LaserMasters] closed down operations for Global Printer and Parts Now here in Madison, we have hired most of the Global staff and launched a remanufactured printers division as of November.

*Id.* ¶ 123. As a result of Liberty's false statements, plaintiffs' sales have suffered: GPS's annual gross revenue is about half of what Global Printer Services' annual gross revenue was before the acquisition. Also, Liberty owes LaserMasters $27,246.28 for parts it bought in the spring of 2017, which it refuses to pay.

Plaintiffs filed suit against Andre and Liberty in June 2017.

ANALYSIS

Liberty moves to dismiss plaintiffs' claims of tortious interference with contract, trade secret misappropriation, and deceptive trade practices. To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to state a plausible claim for relief, that is, facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court is not bound to accept alleged legal conclusions. *Id.* at 827.

## A. Tortious interference with contract

The parties agree that Wisconsin law governs. To state a claim for tortious interference with contract, a plaintiff must allege that "(1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective

4

contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere." *Share Corp. v. Momar Inc.*, No. 10-cv-109, 2011 WL 2600740, at *2 (E.D. Wis. June 29, 2011) (citing *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)). Interference must be intentional and improper: "the defendant must act with a purpose to interfere[, otherwise the] conduct does not subject him or her to liability even if it has the unintended effect of deterring a third party from dealing with the plaintiff." *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203, 209 (Ct. App. 1995) (quoting *Cudd v. Crownhart*, 122 Wis. 2d 656, 364 N.W.2d 158, 160 (Ct. App. 1985)). And plaintiffs must plead interference with a specific contractual right. *Sampson Invs. v. Jondex Corp.*, 176 Wis. 2d 55, 499 N.W.2d 177, 184 (1993).

Plaintiffs allege that Liberty tortuously interfered with GPS's and LaserMaster's contracts or "business expectation" with their customers, their employees, and Andre by telling their customers that GPS had closed, directing their employees to disclose GPS's confidential and proprietary information, actively assisting in poaching GPS's employees, and interfering "with the ability of GPS and Andre to perform under the terms and covenants of GPS'[s] Separation Agreement with Andre, to the detriment of GPS." Dkt. 25, ¶¶ 174, 181.

Beginning with Andre's contract, plaintiffs conclusorily allege that Liberty interfered with that contract. The court can infer what specific contractual rights would be at issue in this claim, but plaintiffs' complaint contains no allegations that Liberty intentionally interfered with them. Instead, plaintiffs' allegations indicate that Andre was ready and willing to breach his contractual obligations on his own. Because plaintiffs have not pleaded any factual support

for the allegation that Liberty intentionally induced Andre to breach them, the court will dismiss that claim.

As for GPS's and LaserMaster's customers, plaintiffs do not allege interference with a specific contractual right—in fact, they do not allege the existence of any contract or prospective contract at all. They allege that they had "a contract or business expectation with regard to their valued . . . customers, whereby LaserMasters and GPS expected to retain those employees and customers" and that Liberty's interference "led to the breach or termination of the customer relationship." Dkt. 25, ¶¶ 174, 180. But "Wisconsin does not recognize a cause of action for interference with 'mere economic or business relations' short of 'interference in the absence of an existing contract or sufficiently concrete prospective contract.'" *Extang Corp. v. Laurmark Enters. Inc.*, No. 12-cv-372, 2013 WL 12234254, at *9 (W.D. Wis. Apr. 11, 2013) (quoting *Shank*, 192 F.3d at 685–88). Allegations of business relationships and reasonable expectations that those relationships would continue are not enough. *Id.* So the court will dismiss this claim, too.

But plaintiffs state a tortious interference claim concerning the employee contracts. They allege that GPS and LaserMasters had contracts with their employees and that Liberty interfered with specific contractual rights: the restrictive covenants and trade secret protections contained in the GPS employee handbook and the expectation that their employees would continue to work for them. Even if the employees were at-will, "Wisconsin law permits a tortious interference with contract claim in the case of an at-will employee." *Duncan v. Manning*, 998 F. Supp. 2d 725, 733 (E.D. Wis. 2014) (citing *Lorenz v. Dreske*, 62 Wis. 2d 273, 214 N.W.2d 753, 760 (1974)). They allege that the interference was intentional: Liberty asked GPS employees to bring GPS's salary information price lists, standard operating procedures,

and checklists with them to their new job and offered cash incentives for poaching additional GPS employees. And they allege that they sustained damages as a result: they lost several key employees and their profits decreased considerably. Liberty argues that these acts weren't improper. But under Wisconsin law, all plaintiffs need to do at the pleading stage is "assert that the act or acts constituting intentional interference was, in fact, not privileged." *Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, ¶ 38, 274 Wis. 2d 719, 685 N.W.2d 154. The burden is on Liberty, as the defendant, to establish privilege or justification. *Id.* So the court will not dismiss the tortious interference claim as it relates to GPS employees .

**B. Uniform Trade Secrets Act**

Plaintiffs allege Liberty misappropriated GPS's trade secrets in violation of Wisconsin's Uniform Trade Secrets Act (UTSA), Wis. Stat. § 134.90. The UTSA bars disclosing or using without consent a trade secret acquired through improper means. It defines a trade secret as

> Information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c).

Plaintiffs identify GPS's standard operating procedures and checklists for remanufacturing printers as trade secrets. They allege that the procedures and checklists represented "the most effective methodologies for remanufacturing printers" and were "important to the success of GPS," therefore GPS made clear in its employee handbook and

7

elsewhere that they were to be kept confidential; it prohibited employees "from acquiring by improper means, using, or disclosing trade secret information." Dkt. 25, ¶¶ 94–95, 102.

Liberty argues that these allegations don't allow one reasonably to infer independent economic value or a reasonable effort to maintain secrecy, pointing to *ECT International, Inc. v. Zwerlein*, 228 Wis. 2d 343, 597 N.W.2d 479, 482 (Ct. App. 1999). But plaintiffs' allegations are more specific and detailed than the bare recitation of statutory elements that *ECT* concluded was insufficient. *See id.* ("ECTI alleges that '[t]he software file system for "promis.e" is a trade secret in that it is a program which derives independent economic value from not being generally known or ascertainable by proper means and is the subject of effects by ECTI to maintain its secrecy.' . . . These allegations echo § 134.90 [and] fail to allege the ultimate facts showing the existence of a trade secret."). Plaintiffs' allegations permit Liberty and the court "to ascertain at least the boundaries within which the secret lies," which is sufficient at the pleading stage. *Id.* (quoting *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 23 (Ct. App. 1968)). Liberty points to *Fail-Safe, LLC v. A.O. Smith Corp.*, but in that case, the Seventh Circuit affirmed summary judgment in the defendant's favor when the plaintiff "failed to take *any* steps to protect its information." 674 F.3d 889, 893 (7th Cir. 2012). Here, plaintiffs allege some independent precautionary measures. Liberty argues that the fact that Kastenmeier could make off with the procedures and checklists proves that GPS did not take reasonable measures to maintain their secrecy, but such an interpretation would render the USTA useless—once a trade secret was misappropriated, it would cease to be a trade secret. Plaintiffs have adequately alleged that GPS's efforts to maintain the confidentiality of the procedures and checklists was reasonable under the circumstances.

8

Finally, Liberty contends that *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 708–09 (7th Cir. 2006), and *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 350 (7th Cir. 2006), *abrogated on other grounds by RTP LLC v. ORIX Real Estate Capital, Inc.*, 827 F.3d 689 (7th Cir. 2016), require a heightened pleading standard. But those cases reviewed a directed verdict after the liability phase of trial and a grant of summary judgment, respectively. They identify evidence that would be *sufficient* to meet the UTSA's definition of a trade secret, but there's no indication that similar allegations are *necessary* at the pleading stage. As the court has previously noted, trade secret misappropriation is easy to plead but hard to prove. *See Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 800 (W.D. Wis. 2017). The court will deny Liberty's motion to dismiss the trade secret misappropriation claim.

C.  Deceptive Trade Practices Act

Plaintiffs allege that Liberty violated the Wisconsin Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18, by telling GPS customers that GPS was leaving the remanufacturing business. DTPA claims have three elements: (1) the defendant made a representation to "the public" with the intent to induce an obligation; (2) the representation was "untrue, deceptive or misleading"; and (3) the representation materially caused a pecuniary loss to the plaintiff. *Grice Eng'g, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915, 922 (W.D. Wis. 2010) (citing *Novell v. Migliaccio*, 2008 WI 44, ¶ 49, 309 Wis. 2d 132, 749 N.W.2d 544).

Liberty contends that to state a claim under the DTPA, the plaintiff must be a member of the public to whom the misrepresentation was made. Plaintiffs contend that the DTPA contains no such requirement, pointing to *Tim Torres Enterprises, Inc. v. Linscott*, in which a business sued its competitor over representations made to potential customers. 142 Wis. 2d 56, 416 N.W.2d 670 (Ct. App. 1987).

9

The same issue and the same arguments were presented to the court in *Grice*. There, Judge Crabb noted that the Wisconsin Supreme Court "has not addressed the question whether a plaintiff can state a claim under Wis. Stat. § 100.18 for misrepresentations made to a third party." 691 F. Supp. 2d at 922. She acknowledged *Tim Torres* but noted that there, "the court of appeals did not have occasion to consider whether § 100.18 supports a cause of action by a plaintiff who was not the recipient of the misrepresentations because the parties never raised the issue." *Id.* at 923. She looked instead to the purpose of the DTPA, "which is specifically 'to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product' to a consumer[, not] to protect product manufacturers from the deceptive acts of their competitors." *Id.* (quoting *K & S Tool & Die Corp.*, 2006 WI App 148, ¶ 26, 295 Wis. 2d 298, 720 N.W.2d 507). She noted that the Wisconsin Supreme Court's decision in *Novell* aligned with this purpose: it explained that *reliance* on the misrepresentation is an aspect of the third element under the DTPA.

Judge Crabb's reasoning is persuasive, and plaintiffs offer no reason not to follow it. They argue only that "[w]here the state supreme court has not ruled on an issue, decisions of intermediate state courts control unless there are persuasive indications that the highest state court would decide the issues differently." *Clarin Corp. v. Mass. Gen. Life Ins. Co.*, 44 F.3d 471, 474 (7th Cir. 1994). Here, the purpose of the DTPA and the Wisconsin Supreme Court's interpretation of the DTPA in *Novell* are persuasive indications that were this issue to come before the Wisconsin Supreme Court, it would hold that a business cannot state a claim for misrepresentations made by its competitor to a third party. So the court will grant Liberty's motion to dismiss the DTPA claim.

10

ORDER

IT IS ORDERED that defendant Liberty Parts Team, Inc.'s motion to dismiss, Dkt. 28, is GRANTED in part, as explained above.

Entered October 31, 2017.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge