IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GARY WILLERT, LISA WILLERT,
LASERMASTERS, LLC, and GPS HOLDINGS,
LLC,

                        Plaintiffs,                    OPINION & ORDER

            v.                                         17-cv-496-jdp

BRUCE ANDRE and LIBERTY PARTS TEAM,
INC.,

                        Defendants.

Plaintiffs Gary and Lisa Willert are the sole members of plaintiff LaserMasters, LLC, a refurbisher of toner cartridges for printers. In 2014, LaserMasters acquired Global Printer Services, Inc., a printer remanufacturer, from defendant Bruce Andre. Plaintiffs allege that Andre breached the contract covering the acquisition by encouraging several Global Printer employees to go to work for its competitor, defendant Liberty Parts Team, Inc., and by falsely informing Global Printer customers that Global Printer had gone out of business. Plaintiffs assert various state-law claims against defendants. Dkt. 25. Each defendant now moves for summary judgment. Dkt. 65 and Dkt. 77. Because plaintiffs have failed to adduce evidence to support any of their claims, the court will grant summary judgment in defendants' favor. Plaintiffs' case was not a strong one, and perhaps they should have abandoned some claims, but the court will deny Andre's motion for sanctions. Dkt. 125.

UNDISPUTED FACTS

Some of plaintiffs' proposed facts are conclusory and lack evidentiary support. And many of plaintiffs' proposed facts contain multiple factual propositions in each paragraph, contrary to the court's procedures on motions for summary judgment. *See* Dkt. 51, at 3. The court will accept a proposed fact as true where no party disputes it, and where the proponent cites to admissible evidence in support of the fact, and the other side offers no evidence in response.

The following facts are undisputed except where noted.

This case concerns the printer and cartridge refurbishing and remanufacturing industry. There are three main types of businesses in this industry: (1) remanufacturers, which rebuild printers and toner cartridges to the original manufactured product's specifications using reused, repaired, and new parts; (2) refurbishers, which clean and repair minor defects in printers and cartridges; and (3) parts suppliers, which supply parts for remanufacturers and refurbishers.

In the early 1990s, defendant Bruce Andre worked for Parts Now!, a parts supplier in Wisconsin owned by David Reinke. Andre left Parts Now! in 1995 and founded Global Printer Services, Inc., a printer remanufacturer in Wisconsin. But Andre and Reinke remained on good terms and have kept in touch. Reinke sold Parts Now! in 1999. In 2004, he founded Liberty Parts Team, Inc., another parts supplier also located in Wisconsin.

Meanwhile, in 1996, plaintiffs Lisa and Gary Willert bought LaserMasters, LLC, a business focusing almost exclusively on remanufacturing toner cartridges. (LaserMasters is headquartered in Arizona and is also known as "LMI Solutions.") In 2014, LaserMasters, through a subsidiary, GPS Holdings, LLC, acquired Global Printer from Andre. Under the terms of the contract governing the acquisition, Global Printer was to pay Andre $5,500,000

2

and LaserMasters was to issue Andre 75,000 membership units in LaserMasters. In exchange, Andre agreed to be bound by several restrictive covenants. Three restrictive covenants are at issue in this suit. First, the noncompetition covenant barred Andre from investing in, owning, managing, operating, financing, controlling, advising, consulting, or guaranteeing the obligations of any "printing remanufacturing sales and services" business for five years. Dkt. 25-1, ¶¶ A, 12.1. Second, the nonsolicitation covenant barred Andre from causing or inducing any customer, supplier, licensee, franchisee, employee, or consultant of Global Printer to cease doing business with Global Printer or to stop working with Global Printer for five years. *Id.* ¶ 12.2. Third, the nondisparagement covenant barred Andre from making any statement about Global Printer that would cause or tend to cause the recipient to question Global Printer's "business condition, integrity, competence, fairness, or good character." *Id.* ¶ 12.3.

Post-acquisition, plaintiffs controlled Global Printer, although Andre was still involved—he was named president of Global Printer. (The parties dispute whether Global Printer continued to operate under the Global Printer name post-acquisition, and no one adduces decisive evidence on the issue. The issue is not material, so for simplicity, the court will refer to it as Global Printer regardless of the time period.) But Andre's involvement was short lived. In August 2015, Gary Willert fired Global Printer's vice president and filled the position with his son, Matt Willert. Shortly after, Andre decided to leave the company and sell his membership units back to LaserMasters. Under a series of contracts governing the buyout, Andre reaffirmed his commitment to be bound by the restrictive covenants, and the Willerts agreed to pay him $2,150,000. The Willerts have yet to pay most of that amount; their failure to do so is the subject of a related lawsuit, *Andre v. Willert*, No. 17-cv-598 (Dane Cty. Cir. Ct.

filed Mar. 13, 2017). While Andre and the Willerts were negotiating the buyout, LaserMasters acquired Parts Now!. The contracts for that buyout were signed on November 13, 2015.

Andre had personal relationships with many Global Printer employees. In fact, he frequently referred to them as "family." Dkt. 61 (Andre Dep. 35:10–12). He remained in touch with several Global Printer employees after he left the company. Andre's communications with those employees and Reinke during this time form the basis for most of plaintiffs' claims, so the court sets them out here in detail.

On November 13, 2015, Reinke called Andre and congratulated him on the buyout. The next day, Andre texted Global Printer employee Diana Wearing, asking for Chad Anderson's number. (We don't know who Chad Anderson is.) The following week, he met with Tom Gantenbein, another Global Printer employee.

In January 2016, Andre had lunch with Reinke.

On February 9, Andre exchanged the following text messages with Wearing:

| | |
|---|---|
| Andre: | How did the meeting go yesterday? Did they get rid of anyone? |
| Wearing: | Happened after I left—haven't had a chance to talk to Mike or Tom yet…I'll let you know |
| Andre: | No news is probably good news |
| Wearing: | Probably… |

Dkt. 102-5, at 5. The next week, Wearing texted Andre, thanking him for "pick[ing] up the tab" "the other night." *Id.*

On March 3, Andre and Gantenbein texted:

| | |
|---|---|
| Andre: | I heard about MN and Ladd. How are you? |
| Gantenbein: | Livin the dream |

| | |
|---|---|
| Andre: | Let me know if you want to get together for a beer after work. |
| Gantenbein: | I will let you know. Not sure at this point. Thanks |
| Andre: | OK |
| Gantenbein: | Ok yes. . . . |

Dkt. 102-7, at 1. The parties indicate that "MN" refers to LaserMasters' planned closing of a facility in Minnesota and that "Ladd" refers to another Global Printer employee who had recently resigned.

On March 16, Andre talked to another Global Printer employee, Roy Divine. The next day, Andre exchanged the following text messages with Wearing regarding Divine:

| | |
|---|---|
| Wearing: | Just in case you haven't heard… They fired Roy this afternoon |
| Andre: | I heard. Did he know it was coming |
| Wearing: | No…he did say he told you last night he had a feeling something had changed—he was right… |
| Andre: | I thought he was talking about not being a manager |

Dkt. 102-5, at 6–7.

On March 28, Global Printer employee Elyse Birkett texted Andre:

| | |
|---|---|
| Birkett: | So I'm pretty sure I'm putting my notice in this week. 3 weeks out, right before my vacation. I am not a risk taker, I'm sort of freaking out. |
| Andre: | Wow. I just got your message. How are you doing? Did something happen, or just enough is enough? |
| Birkett: | Ughh enough!!! Just may have spoken to a voice of reason for the last hour though so slight mind change. |
| | Skippy essentially wants me to schedule Atlanta production for Linwood. Fucking ridiculous. |

| Andre: | Big decision, probably good to take your time. |
|---|---|
| | Fucking ridiculous |
| Birkett: | But regardless, hitting it hard to get out so keep your ears to the wall for me if you hear of anything please let me know! |

Dkt. 102-8, at 7–8. During a deposition, Andre testified that "Skippy" probably refers to Matt Willert. Birkett and Andre didn't text again for more than two weeks.

On May 2, Gantenbein and Andre met at Andre's house. On May 31, Gantenbein sent Andre the following text messages:

| Gantenbein: | Mike G got Leroy go |
|---|---|
| | Let go |

Dkt. 102-7, at 3. On June 1, Gantenbein met Andre at a bowling alley.

On Monday, June 6, Wearing texted Andre:

| Wearing: | Hi Bruce—you've got a stack of mail here…Matt will be out of the office Tuesday and Wednesday if you want to stop by and pick it up :) |
|---|---|
| Andre: | Sounds good I will stop in |

Dkt. 102-5, at 12–13. Later that day, Andre texted Wearing again:

| Andre: | I am going to stop in at 9:00 on Wednesday. The insurance company wants to do a walk through |
|---|---|

*Id.* at 13. (Andre still owned the property where Global Printer's offices were located, and his insurance company had asked him to schedule a time for a "loss control survey." Dkt. 117-1; *see also* Dkt. 117, ¶¶ 6–8.)

On Tuesday, June 7, Birkett texted Andre:

| Birkett: | Just put my notice in, last day next Friday. Old GPS happy hour next Thursday at waypoint public house in Monona—come hang! |
|---|---|

| Andre: | Wow! Very cool. LPT? |
|---|---|
| Birkett: | Yep. Or….I mean…maybe lol |
| Birkett: | I have another offer from hometown pharmacy too (which I turned down but haven't told anyone that), back to back offers. It was a pretty darn good weekend! |
| Andre: | Congrats either way. Talk to you later |
| Birkett: | Oh and I got preapproved for a house. Finally moving in the right direction again! |

*Id.* at 10–11. That same day, Birkett emailed several Global Printer employees, including Brehm, informing them of her imminent departure and inviting them to an "'old global' happy hour" the following Thursday. Dkt. 102-11, at 2. Brehm responded, suggesting that seven other people (whom the court takes to be former Global Printer employees) should be invited, too. One of the seven names mentioned was Bruce.

Also on June 7, Andre talked to Reinke. Andre doesn't remember what the conversation was about.

On Wednesday, June 8, Andre visited Global Printer's office, where he picked up his mail and accompanied an insurance company representative on the loss control survey. While there, he talked with Wearing. He also saw Brehm.

That afternoon, Gantenbein texted Andre:

| Gantenbein: | Have you talked to David lately. Rumor has it. They were thinking about doing printers |
|---|---|
| Andre: | I talked to him last night but he didn't mention it |
| Gantenbein: | Probably just a rumor. Heidi got a job there in purchasing |
| Andre: | I don't know if that is true or not |
| | Might be worth it, I just don't know |

|  |  |
|---|---|
| Gantenbein: | Ya know I would probably work for less if it was for you. |

Dkt. 102-7, at 4–5. According to Andre, this is the only time he and Gantenbein discussed Liberty.

That same day, Brehm received a call from Richard Jordan, a Liberty employee, who told her that Liberty was losing someone and needed a replacement. Brehm went to Liberty's office over the lunch hour, met with Reinke, and received a job offer. That evening, Brehm texted Andre:

|  |  |
|---|---|
| Brehm: | So, I was offered the job at LPT. Talked to David for quite a[]while. I think I am going to accept it and put my notice in tomorrow. I feel if you were still there, not even as an owner, but still there I would not even consider this. I would be loyal to you & I told David that. LMI has no loyalty to anyone & I need to take care of myself. I look forward[]to seeing you next Thursday. Is Cindy going to come too? |
| Andre: | I think it is a good thing for you to get out of what's going on now. |
| Brehm: | Thank you, I just wanted you to hear it from me. David told me he talked to you last night, so I feel better about that too. |

Dkt. 102-10, at 2–3.

The next day, June 9, Brehm resigned from Global Printer.

On June 10, Andre texted Birkett:

|  |  |
|---|---|
| Andre: | can you send me Steve miklos' cell please. My phone seem to have deleted it |
| Birkett: | I'm not sure I know who that is! |
| Andre: | Sunprint |
|  | I can check with Roy |

8

| | |
|---|---|
| Birkett: | Oh, I don't know him—only Judy and Nikolle, I am off today though, maybe check with Roy otherwise I can see if it's in Mas on Monday |
| Andre: | I will check with Roy |

Dkt. 102-8, at 11–12. MAS was Global Printer's database for customer contact information. The parties agree that Steve Miklos works for Sun Print, a customer of Global Printer. Andre explains that Miklos was also his personal friend, whom he had visited in the past, and that he wanted to contact Miklos about another visit. Andre texted Divine with the same request, but Divine didn't have Miklos's number, either.

On June 16, Brehm posted on Facebook that she attended a happy hour with Andre and others.

On June 21, Gantenbein texted Andre:

| | |
|---|---|
| Gantenbein: | Plans this week? |
| Andre: | Here tomorrow and gone until Tuesday |
| | How late does Eddie work? |
| Gantenbein: | 5:30 |
| | Want to meet for a beer? |
| Andre: | Tomorrow? |
| | I have plans tonight |
| Gantenbein: | Sure |
| Andre: | What time? |
| Gantenbein: | 5:30ish |
| Andre: | OK |

Dkt. 102-7, at 5–6. The next day, Gantenbein cancelled his plans with Andre. They later agreed to meet at a restaurant on July 21. On August 1, Gantenbein submitted his resume to Liberty.

By that time, Brehm and Birkett were working at Liberty. Brehm told Greg Kastenmeier, another Global Printer employee who was actively looking for a new job, that Reinke wanted to start remanufacturing printers. Kastenmeier sent his resume to Liberty. On August 8, Liberty offered Kastenmeier a job. Kastenmeier accepted, and when he arrived at Liberty, he brought with him a flash drive containing various documents that he had created while working at Global Printer. He also called two Global Printer employees, Shane Franks and Jason Parks, at Liberty's behest to convince them to switch employers. Franks and Parks eventually did so because they were worried about the terminations at Global Printer.

On August 22, Gantenbein asked Andre to meet him at another restaurant the following day. On August 29, he texted Andre:

> Gantenbein: Building on PFLAUM for sale $895,000
>
> Just FYI
>
> Do you want me to email you the information

*Id.* at 9. Andre did not respond. He now explains that he had been "looking for a real estate opportunity," but that he never followed up on it. Dkt. 61 (Andre Dep. 181:9–10). Gantenbein now owns a company called Premier Laser Printers, which the parties agree is a printer remanufacturer.

In October, Brehm texted Michael Kocevor, another Global Printer employee who had applied for a job at Liberty:

> Brehm: You may soon be in luck! Bruns & David are talking about bringing you in. I hope they do! Print out any lists you can out of MAS for purchasing.
>
> Stephanie, the general manager would like you to call her [phone number redacted]

Dkt. 102-23. According to Reinke, he did not direct Brehm to ask Kocevor for information from MAS. Eventually, Liberty hired Kocevor.

In mid-October, Gantenbein and Andre texted about meeting "for a beer." Dkt. 102-7, at 10–11. They did the same thing in early December and again in February 2017. Also in February, Andre ran into Reinke.

Around the same time, LaserMasters shut down one of its printer remanufacturing operations in Georgia and moved it to Mexico. At that point, plaintiffs did not intend to move Global Printer's operations to Mexico, but due to a decrease in demand, they continued to lay off Global Printer employees.

In sum, between April 2016 and April 2017, 59 of Global Printer's 76 employees stopped working for plaintiffs. Most left involuntarily; a handful resigned. LaserMasters replaced some of these employees with new hires, but it's unclear how many. At least 30 of the former Global Printer employees applied to work at Liberty; Liberty hired 15 of them in total. In an April 2017 Department of Labor filing, LaserMasters explained that in the previous year, it had "reduced manufacturing operations for laser printers in Madison, WI due to excessive cost and decreased demand," and that it "[m]oved some remanufactured printer operations from McFarland, WI to Mexico" in March 2017. Dkt. 89-7, at 4.

On April 4, 2017, a member of Liberty's sales team sent an email including the following statement to an outside business, apparently with the intent to drum up interest in refurbished printers:

> Since LMI closed down operations for Global Printer and Parts Now here in Madison, we have hired most of the Global staff and launched a remanufactured printers division as of November.

Dkt. 87-1, at 2. By June 2017, plaintiffs had completely shut down Global Printer's printer remanufacturing operations.

Meanwhile, on April 17, 2017, Andre filed suit against GPS Holdings, seeking a declaratory judgment that he had not breached any provisions of the contracts governing the November 2015 buyout. *See Andre v. GPS Holdings, LLC*, No. 17-cv-925 (Dane Cty. Cir. Ct. filed Apr. 17, 2017). On May 24, Andre moved for default judgment.[1] In June, plaintiffs appeared and moved to dismiss the action. On June 26, the Dane County Circuit Court held a status conference and set briefing on Andre's motion for default judgment. On June 27, plaintiffs filed their complaint in this case. Dkt. 1. On August 24, the Dane County Circuit Court granted Andre's motion for default judgment and entered a declaratory judgment that Andre had not breached any provisions of the contracts governing the November 2015 buyout. *See* Dkt. 79-16.

## ANALYSIS

Each defendant moves for summary judgment on all of plaintiffs' claims. To succeed on their motions, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). If plaintiffs fail to establish the existence of an essential element on which they will bear the burden of

---

[1] The state court record is available at https://wcca.wicourts.gov/caseDetail.html?caseNo=2017CV000925&countyNo=13.

proof at trial, summary judgment in defendants' favor is proper. *See Celotex*, 477 U.S. at 322. All reasonable inferences from the facts in the summary judgment record must be drawn in plaintiffs' favor as the nonmoving parties. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

Before turning to the merits, some housekeeping. For various reasons, plaintiffs have abandoned their claims of (1) trade secret misappropriation and (2) breach of contract based on Liberty's purchase of parts and Andre's buyout contracts. So the court will grant summary judgment in defendants' favor on those claims. The court will now turn to the remaining active claims.

## A. Breach of contract

Plaintiffs claim that Andre breached the three restrictive covenants in the contract governing plaintiffs' acquisition of Global Printer from Andre. Andre contends that several threshold issues bar plaintiffs' breach-of-contract claims, but the court will bypass those issues because these claims can be resolved simply on the merits.

The parties agree that Arizona law governs plaintiffs' contract claims. So to succeed on their claims, plaintiffs must prove that (1) there is a contract between themselves and Andre; (2) Andre breached the contract; and (3) they were damaged by the breach. *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617 (Ariz. 2013) (en banc). The second element is at issue here: did Andre breach any provision of the contract? The court will address each of the contract provisions at issue separately.

### 1. Nonsolicitation covenant

The nonsolicitation covenant provides that for five years, Andre will not

> directly or indirectly

(a) Solicit the business of any person or entity that was a customer of [GPS Holdings or Global Printer] prior to the Closing Date;

(b) cause, induce, or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of [GPS Holdings] to cease doing business with [GPS Holdings] or to deal with any competitor of [GPS Holdings];

(c) cause, induce, or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of [Global Printer] on the Closing date or within the year preceding the Closing date to cease doing business with [GPS Holdings] or to deal with any competitor of [GPS Holdings]; or

(d) solicit the employment of any employee or independent contractor of [GPS Holdings] with the intention of causing such employee or independent contractor of [GPS Holdings] to terminate the employment or independent contractor relationship with [GPS Holdings].

Dkt. 25-1, ¶ 12.2. It appears that plaintiffs bring their claim under part (d). They contend that Andre breached the covenant by convincing Birkett and Brehm to leave Global Printer and join Liberty. But plaintiffs adduce no evidence that Andre did so. They argue that Andre solicited Global Printer employees by continuing to socialize with Global Printer employees, including attending happy hours and sometimes picking up the tab. But these acts in themselves are not solicitation; Andre was not barred from staying in touch with his friends after he left the company.

Plaintiffs also argue that they have documentary evidence of Andre's solicitation of Birkett and Brehm, in the form of text exchanges. First, they point to Andre's March 28, 2016 texts with Birkett. But in those texts, Birkett reached out to Andre about considering leaving Global Printer, not the other way around. And in response, Andre asked Birkett questions ("How are you doing? Did something happen, or just enough is enough?" Dkt. 102-8, at 7)

and he suggested that she take her time making a decision ("Big decision, probably good to take your time." *Id.* at 8). These texts do not show that Andre was trying to get Birkett to move to Liberty. Plaintiffs focus on Andre's final text, "Fucking ridiculous," in response to Birkett's text, "Skippy essentially wants me to schedule Atlanta production for Linwood. Fucking ridiculous." *Id.* It's not clear exactly what Andre's text meant—Andre testified at his deposition that it meant nothing. But viewed in context, it does not appear that Andre was trying to get Birkett to leave Global Printer or join Liberty, nor does it appear that his texts had that effect: despite her original intention of quitting immediately, Birkett stayed at Global Printer for more than two months after this exchange, and she later explained that Andre had "no role" in her decision to leave Global Printer. Dkt. 84, ¶ 6.

Second, plaintiffs point to Andre's June 8, 2016 texts with Brehm. Plaintiffs mischaracterize the sequence of the events concerning Brehm, arguing that Brehm discussed a job opportunity at Liberty with Andre, that Andre then discussed Brehm's candidacy with Reinke, that the next day, Andre advised Brehm to "get out of what's going on now," and that the day after that, Brehm quit her job with Global Printer. Dkt. 105, at 45–46. But the evidence does not support this version of the events. Rather, the undisputed evidence shows that on June 7, Andre talked to Reinke. On June 8, Andre visited Global Printer's office for the insurance survey and to get his mail; while there, he saw Brehm. The same day, Brehm got a call from Liberty, interviewed there over lunch, and was offered a position. That evening, she texted Andre, notifying him that she got the offer and thought she was going to take it. She explained that she "would not even consider this" if Andre was still at Global Printer and that she wanted him to hear the news from her. Dkt. 102-10, at 2–3. Andre responded, "I think it

is a good thing for you to get out of what's going on now." *Id.* Brehm thanked him. The next day, Brehm resigned from her position at Global Printer.

In sum, there is no evidence that Andre talked to Brehm about leaving Global Printer or joining Liberty before Brehm interviewed with Liberty, received a job offer, and decided that she would accept the position. It was only then that Brehm notified Andre. In response, Andre told her it was good for her to get out. Plaintiffs surely didn't appreciate that response, but Andre wasn't contractually obligated to try to dissuade Brehm from leaving Global Printer; he was only required to refrain from soliciting her employment elsewhere. There's no evidence that he did so.

### 2. Noncompetition covenant

The noncompetition covenant provides that for five years, Andre will not

> directly or indirectly invest in, own, manage, operate, finance, control, advise, consult, render services to, or guarantee the obligations of any person or entity engaged in [printing remanufacturing sales and services].

Dkt. 25-1, ¶ 12.1. Plaintiffs contend that Andre breached this covenant by assisting Liberty and Premier Laser Printers, the company that Gantenbein now owns. Plaintiffs' main argument is that Andre must have been helping out Reinke's and Gantenbein's businesses because he communicated frequently with them.

Plaintiffs' characterization of Andre's communications with these individuals as "frequent" is questionable—the evidence, viewed in the light most favorable to plaintiffs, indicates that over a 15-month period, Andre spoke with Reinke five times and met or texted with Gantenbein about a dozen times. And there is no evidence that Andre ever offered them advice about their businesses.

Plaintiffs point to two items of evidence in particular to support their claim. First, they adduce Brehm's final text on June 8, which states, "Thank you. I just wanted you to hear it from me. David told me he talked to you last night, so I feel better about that too." Dkt. 102-10, at 3. Plaintiffs argue that this indicates that Andre and Reinke "discussed at least one prospective candidate for a job at Liberty." Dkt. 105, at 47. It's not clear from the statement exactly what Andre and Reinke discussed on the night of June 7. Andre says he doesn't remember, and Brehm's texts indicate that whatever they talked about, it *wasn't* her candidacy for a job at Liberty because she begins her text with an announcement that she received a job offer and explains that she wanted Andre to hear it from her. Plaintiffs offer no more than conjecture that Andre advised Reinke on Liberty's operations.

Second, plaintiffs adduce Gantenbein's August 29, 2016 text to Andre stating, "Building on PFLAUM for sale $ 895,000." Dkt. 102-7, at 9. Plaintiffs argue that this was "warehouse space" and that "conveniently enough, Mr. Gantenbein now owns his own printer remanufacturing business." Dkt. 105, at 47. There's no evidence that the Pflaum property was a warehouse, but even if it were, there's no indication that the warehouse was for Gantenbein's business, that either Gantenbein or Andre bought the property, or even that Andre ever followed up on Gantenbein's text. In fact, plaintiffs do not even explain when Gantenbein founded or bought his business or where it is located. No reasonable juror could infer from the mere fact that Gantenbein texted Andre about a property for sale that Andre financed, managed, consulted, or advised Gantenbein's business.

### 3. Nondisparagement covenant

The nondisparagement covenant provides that Andre will not

make a derogatory or disparaging statement regarding [GPS Holdings or its] managers, members, officers, employees, or agents.

Dkt. 25-1, ¶ 12.3. It defines "derogatory or disparaging statement" as

any communication, oral or written, which would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person to whom or entity to which the communication relates.

*Id.*

Plaintiffs claim that three specific statements breached this covenant: (1) Andre's "fucking ridiculous" text to Birkett; (2) Andre's "I think it is a good thing for you to get out of what's going on now" text to Brehm; and (3) Birkett's use of "Skippy" in a text to Andre. It should go without saying that the third statement does not violate the nondisparagement covenant, because the statement was not made by Andre. Plaintiffs complain that he didn't object to Birkett's use of the word "Skippy," which they believe referred to Matt Willert and which they argue is clearly derogatory. But Andre was not contractually obligated to defend plaintiffs' companies or employees against petty insults from others.

The first two statements were indeed made by Andre, but they do not fall within the contractual definition of disparagement. The text to Brehm was focused on her, not plaintiffs or their employees. The phrase "what's going on now" appears to refer to plaintiffs' management of Global Printer, but it's so vague that no reasonable juror could find that it would have caused Brehm to question plaintiffs' "business condition, integrity, competence, fairness, or good character," which is the only relevant question under the contractual definition. The "fucking ridiculous" text to Birkett simply repeated a phrase used by Birkett. Drawing all reasonable inferences in plaintiffs' favor, Andre agreed with Birkett that Matt

Willert's request that Birkett "schedule Atlanta production for Linwood" was "fucking ridiculous." Dkt. 102-8, at 7–8. But again, there's no indication that he caused her to question plaintiffs' competence; rather, the evidence indicates that both she and Brehm thought negatively of plaintiffs *before* they contacted Andre, not the other way around. Thus, plaintiffs have not adduced evidence that the allegedly disparaging comments meet the contractual definition, so they cannot prove a breach of the covenant. For the same reason, plaintiffs have not adduced evidence that they were damaged by the alleged breaches.

Finally, plaintiffs argue that it's "almost unfathomable that Mr. Andre attended so many of these happy hours yet never participated in any negative conversation" about plaintiffs. Dkt. 105, at 46. This is conjecture unsupported by any evidence. And it is certainly not "unfathomable" that Andre avoided disparaging Global Printer because he had a contractual obligation not to do so.

The bottom line is that plaintiffs point to no evidence that Andre breached any of the restrictive covenants in his contract, so the court will grant summary judgment in his favor on these claims.

## B. Breach of implied covenant of good faith and fair dealing

Plaintiffs also claim that through the actions discussed above, Andre also breached the covenant of good faith and fair dealing that is implied in every contract. The parties disagree about which state's law applies to this claim—Andre cites Wisconsin law, whereas plaintiffs cite Arizona law. The court need not determine which law governs, because plaintiffs' claim fails regardless.

To establish a breach of the duty of good faith under Arizona law, plaintiffs must show that Andre denied them the reasonably expected benefits of the contract. *FL Receivables Tr.*

*2002-A v. Ariz. Mills L.L.C.*, 281 F.3d 1028, 1037 (Ariz. Ct. App. 2012). Plaintiffs argue that Andre's actions, discussed above, breached the three restrictive covenants and therefore denied them the reasonably expected benefits of the contract—in other words, plaintiffs attempt to repackage their claims of breach of express contractual provisions as claims for breach of the implied duty of good faith. For the reasons explained above, plaintiffs have not adduced evidence from which a reasonable juror could infer that Andre did so. Plaintiffs' claim necessarily fails under Wisconsin law, too because Wisconsin does not allow a plaintiff to simply repackage a breach of an express contractual provision as a breach of the implied duty of good faith. *See Middleton-Cross Plains Area Sch. Dist. v. FieldTurf USA, Inc.*, No. 16-cv-278, 2016 WL 6459831, at *2 (W.D. Wis. Oct. 31, 2016). So the court will grant summary judgment in defendants' favor on this claim, too.

## C. Defamation

Before addressing plaintiffs' defamation claim, the court must resolve Liberty's motion concerning two emails sent from a Liberty employee to third parties in October 2016. Dkt. 110. Liberty asks the court to exclude the emails as evidence because of untimely disclosure. Under Federal Rule of Civil Procedure 37(c)(1), striking evidence from the record is a mandatory sanction for non-disclosure of discovery unless the non-disclosure was justified or harmless.

Here, the issue is not when the emails themselves were disclosed—in fact, it was Liberty that disclosed the emails to plaintiffs. But Liberty contends that plaintiffs should not be allowed to rely on these emails because plaintiffs did not disclose their significance in response to Liberty's interrogatory requesting the date and content of each allegedly defamatory statement made by Liberty. *See* Dkt. 111-1, at 7. It was only in plaintiffs' response brief to Liberty's summary judgment motion that plaintiffs indicated that two emails from October

2016 formed two-thirds of the factual basis for their defamation claim (the remaining third being an April 2017 email that plaintiffs originally listed in their complaint and in response to Liberty's interrogatory). *See* Dkt. 25 and Dkt. 111-2, at 6.

Plaintiffs admit that they didn't list the October 2016 emails in their response to Liberty's interrogatory, although they should have. But they contend that the non-disclosure was justified by Liberty's late production of the emails. The parties argue about who is to blame for the late production, but the bottom line is that plaintiffs never moved to compel the production, despite having ample time to do so, and they obtained the emails at least a week before the dispositive motions deadline, but they still didn't update their response to Liberty's interrogatory to include the emails. Their failure to do so is not justified.

Plaintiffs also contend that the non-disclosure is harmless because Liberty already had the emails, the emails were discussed during two depositions, and Liberty's reply brief in support of its summary judgment motion "fully addresses the arguments made with respect to these emails." Dkt. 122, at 8. The court is not persuaded. Liberty may have possessed the emails, but it was not put on notice that the emails were the foundation for plaintiffs' defamation claim. It relied on plaintiffs' statement that the April 2017 email was the sole communication that plaintiffs claimed was defamatory. The content of the October 2016 emails is similar to the April 2017 email, but as explained in the court's analysis below, the timing of the emails is essential to plaintiffs' claims. Liberty gathered evidence to show that the allegedly defamatory statements were substantially true in April 2017—it did not know that it needed to gather evidence to show that the statements were substantially true back in October 2016. By the time it learned that plaintiffs were claiming the October 2016 emails were defamatory, it had no opportunity to propose any additional facts on the subject in support of

its summary judgment motion. *See* Dkt. 51, at 5–6. So the court will grant Liberty's motion to strike, and only the April 2017 email is a basis for plaintiffs' defamation claim.

The April 2017 email stated that plaintiffs had "closed down operations" in Madison and that Liberty had "hired most of the Global staff and launched a remanufactured printers division." Dkt. 87-1, at 2. Plaintiffs claim that those statements were defamatory. A defamation claim under Wisconsin law (which the parties agree applies) requires plaintiffs to prove that a statement (1) was spoken to someone other than plaintiffs; (2) is false; (3) is unprivileged; and (4) tends to harm plaintiffs' reputation so as to lower them in the estimation of the community or to deter third parties from associating or dealing with them. *See Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 14, 351 Wis. 2d 479, 840 N.W.2d 255.

Liberty contends that the statement at issue was not false. The First Amendment protects true speech, so Wisconsin law places a heavy burden on plaintiffs to prove that the statement at issue is actually false. *Id.* A statement that is "substantially true," even if not "true in every particular," is not considered false under Wisconsin's defamation analysis. *Id.* ¶ 16 (quoting *Lathan v. Journal Co.*, 30 Wis. 2d 146, 140 N.W.2d 417, 423 (1966)).

The evidence concerning plaintiffs' shut-down of Global Printer's Wisconsin printer refurbishment operation and Liberty's hiring of Global Printer's former employees is cloudy. The parties agree that eventually, plaintiffs *did* stop producing refurbished printers in Wisconsin and Liberty *did* hire some of Global Printer's employees. But it's not clear exactly when those events occurred. Plaintiffs point to a single piece of evidence to show that the statement was false: Gary Willert's statement that "[d]uring October 2016, GPS was still remanufacturing printers in Madison, Wisconsin." Dkt. 108, ¶ 45. But that doesn't speak to the statement at issue, which was made in April 2017. Other evidence establishes that by April

2017, Global Printer's original workforce had been reduced by at least three-quarters, its remanufacturing operations had been "reduced" and "moved" to Mexico, and Liberty had hired 15 of its former employees. Dkt. 89-7, at 4. Within two months, Global Printer's Wisconsin operations were shut down entirely. Ultimately, it is plaintiffs' burden to prove that the allegedly defamatory statement is false. Plaintiffs have not adduced evidence from which a reasonable juror could conclude that it was not at least substantially true that plaintiffs had "closed down operations" in Wisconsin by April 2017. So the court will grant summary judgment in Liberty's favor on this claim.

## D. Tortious interference with employee contracts

Finally, plaintiffs claim that defendants interfered with their at-will employee contracts by inducing Global Printer employees to quit and start working for Liberty instead. In Wisconsin, to succeed on a claim of tortious interference, plaintiffs must show that (1) they had a contract or prospective contractual relationship with a third party; (2) defendants interfered with that relationship; (3) the interference was intentional; (4) the interference was improper; and (5) there is a causal connection between the interference and plaintiffs' damages. *Briesemeister v. Lehner*, 2006 WI App 140, ¶¶ 48, 50 & n.8, 295 Wis. 2d 429, 720 N.W.2d 531. Defendants bear the burden on the fourth element, privilege, which is a multifactor inquiry considering "the nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Id.* ¶ 51.

Plaintiffs point to the same evidence discussed in the breach-of-contract analysis to support their tortious interference claim against Andre. For the same reasons discussed above, the evidence would not permit a reasonable juror to find in plaintiffs' favor. Even if socializing

with former employees and failing to dissuade them from quitting their jobs could be considered "interference," Andre has shown that these actions weren't improper. Rather, they were fair and reasonable under the circumstances—Andre was not required to turn his back on the employees he thought of as family once he left the company. And there's no indication that Andre's actions were driven by an improper motive or self-interest—as Andre points out, he is motivated to help plaintiffs succeed so that they are able to continue paying him under the terms of the buyout contract.

As for Liberty, plaintiffs focus on the same allegedly defamatory emails that Liberty employees sent to potential or actual customers. But there's no indication that plaintiffs' employees were aware of those emails or that the emails had any influence on the employees' decisions to leave Global Printer. The same is true of a comic strip published in Liberty's newsletter. *See* Dkt. 102-6, at 2. Plaintiffs also argue that the "cooperation between Mr. Reinke and Mr. Andre" was improper. Dkt. 103, at 33. But there is no evidence that Reinke and Andre cooperated to induce Global Printer employees to move to Liberty. Finally, plaintiffs adduce Kastenmeier's testimony that Reinke had a "vendetta" against Parts Now! or LaserMasters and was happy when he learned that one of LaserMasters's warehouses had burned down. Dkt. 98 (Kastenmeier Dep. 32:13–22). This might be evidence of an improper motive, but improper motive alone doesn't establish any interference.

Of course, Liberty did offer positions to several Global Printer employees while they were still working for Global Printer. Plaintiffs don't mention this in their briefing, perhaps because the law is clear that a competitor is free to "poach" at-will employees as long as it does not employ wrongful means or unlawfully restraint competition. *Restatement (Second) of Torts*, § 768; *see also Wis. Seafood Co. v. Fisher*, 2003 WI App 89, ¶ 12, 263 Wis. 2d 432, 662 N.W.2d

679 (explaining that "Wisconsin has long adhered to the basic interference-with-contract rule of *Restatement (Second) of Torts* § 766," which refers to § 768). The evidence indicates that Liberty offered several Global Printer employees jobs and that those employees accepted the offers because they were unhappy with Global Printer or worried about being laid off. There's no indication that Liberty used wrongful means or restrained competition in the process of hiring Global Printer's employees.

In sum, plaintiffs have not adduced evidence from which a reasonable juror could find that either defendant improperly interfered with plaintiffs' employees' contracts. So the court will grant summary judgment in defendants' favor on these claims.

## SANCTIONS

Andre seeks recovery of all of his attorney fees in this action under Rule 11, 28 U.S.C. § 1927, and Wisconsin Statute section 895.044. Dkt. 125. Plaintiffs substituted new counsel several days after Andre filed his motion. New counsel haven't responded to the motion yet, but plaintiffs' former counsel have. Because the court would award sanctions only against plaintiffs' former counsel, it need not wait for plaintiffs' response.

Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) It is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) The claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for

extending, modifying, or reversing existing law or for establishing new law;

(3) The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11(c) allows for sanctions when Rule 11(b) has been violated. Those sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by other similarly situated." Fed. R. Civ. P. 11(c)(4).

Under § 1927, a district court has the discretion to sanction an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously." Unlike a sanction imposed under Rule 11, a sanction under § 1927 is not limited to cases involving frivolous claims or subjective bad faith. *Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 708 (7th Cir.), *cert. denied*, 137 S. Ct. 391 (2016). But "[s]imple negligence" by the attorney does not warrant a sanction under § 1927. *Id.* The court must be mindful that "sanctions are to be imposed sparingly." *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003). The parties dispute whether Wisconsin Statute section 895.044 applies to diversity actions in this court, but this is a moot point: section 895.044 is an outgrowth of section 802.05, which tracks Rule 11. *See Sears, Roebuck & Co. v. Bayshore Town Ctr., LLC*, 2017 WI App 50, ¶¶ 41–42, 51, 377 Wis. 2d 335, 900 N.W.2d 871. So the court will limit its analysis to Rule 11 and § 1927.

Andre contends that (1) sanctions under Rule 11 are appropriate because plaintiffs never had evidentiary support for their claims and (2) sanctions under § 1927 are appropriate

because plaintiffs' claims in this case duplicate plaintiffs' claims in related state-court actions. The court disagrees for the most part.

Plaintiffs' evidentiary support for their claims is scant, as evidenced by the court granting summary judgment in defendants' favor, but that alone does not allow for an imposition of sanctions under Rule 11. *See Philos Techs., Inc. v. Philos & D., Inc.*, 802 F.3d 905, 917 (7th Cir. 2015). When they filed their complaint, plaintiffs had some reason to suspect that Andre had breached the terms of his contract. They presumably were hoping to uncover additional evidence in discovery, but failed to do so. Their claims were ultimately unsuccessful, but they were not entirely groundless. Also, Andre has not demonstrated that he complied with Rule 11 by serving plaintiffs with his motion and giving them 21 days to withdraw their filings before filing his motion with the court. So the court will not award sanctions under Rule 11.

As for sanctions under § 1927 for plaintiffs' allegedly duplicate claims, the presence of related state-court actions was brought to this court's attention early on in litigation, when Andre moved to stay litigation pending resolution of one of his Dane County lawsuits against plaintiffs. Dkt. 12. The court denied Andre's motion because he had not shown that the two suits involved substantially the same issues. Dkt. 20. But the court warned plaintiffs that "if this case is actually overlapping with Andre's state-court case," they risked paying defendants' attorney fees if they did not dismiss it. *Id.* at 4. For the most part, Andre has made the same mistake in his motion for sanctions as he made in his motion to stay: he still hasn't shown that this suit involves the same issues or claims as the state-court suits. (He filed copies of several state court pleadings, but still neglected to file a copy of plaintiffs' answer and counterclaims in *Andre v. Willert*, No. 17-cv-598, which is allegedly the source of the duplicate claims.)

But plaintiffs' former counsel concede that some of their claims are barred by the declaratory judgment entered in the other Dane County lawsuit, *Andre v. GPS Holdings, LLC*, No. 17-cv-925 (Dane Cty. Cir. Ct. filed Apr. 17, 2017). *See* Dkt. 79-16; Dkt. 105, at 52. In other words, counsel concede that these claims—for breach of provisions of Andre's buyout contracts—duplicate the state-court claims. Counsel point out that the declaratory judgment in *Andre v. GPS Holdings* hadn't yet been entered when they filed the complaint in this case on June 27, 2017. But counsel were aware of *Andre v. GPS Holdings* on June 27, 2017—in fact, the state court record shows that they participated in a status conference in *Andre v. GPS Holdings* just one day earlier. Counsel now argue that the declaratory judgment in *Andre v. GPS Holdings* precludes plaintiffs' claims in this case only if their motion to vacate the judgment and their appeal of the judgment are unsuccessful. That may be. But the point is that the proper venue for determining whether Andre breached provisions of the buyout contracts should have been the Dane County Circuit Court, where this issue was originally raised and was pending when plaintiffs filed their complaint in this court. Plaintiffs' former counsel should not have filed the duplicate claims in this court. By doing so, they unreasonably and vexatiously multiplied the proceedings, which would allow for sanctions under § 1927.

But sanctions under § 1927 are discretionary, not automatic. The court declines to award them here because Andre did not help matters: he was also aware that *Andre v. GPS Holdings* concerned the same contractual provisions at issue in this suit, but he did not inform the court of that fact in his motion to stay (in which he only described the suit as concerning "his obligations to the LLC," *see* Dkt. 13, at 2), nor did he move to dismiss the duplicate claims. Instead, he waited until almost a year after the declaratory judgment was entered in the Dane

County case before filing his motion for sanctions. The court will not reward Andre for his unnecessary delay in bringing this matter to the court's attention.

Liberty's motion for sanctions, Dkt. 135, is pending. The court will rule on that motion in a separate order.

## ORDER

IT IS ORDERED that:

1. Defendant Liberty Parts Team, Inc.'s motion to strike, Dkt. 110, is GRANTED.

2. Defendant Liberty Parts Team, Inc.'s motion for summary judgment, Dkt. 65, is GRANTED.

3. Defendant Bruce Andre's motion for summary judgment, Dkt. 77, is GRANTED.

4. Defendant Bruce Andre's motion for sanctions, Dkt. 125, is DENIED.

5. The clerk of court is directed to enter judgment in defendants' favor and close the case.

Entered July 30, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge